IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

| | | |
|---|---|---|
| PIZZA LOVES EMILY HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:20-cv-00429 |
| | ) | |
| THE CINCINNATI INSURANCE COMPANY, | ) | |
| THE CINCINNATI CASUALTY COMPANY, and | ) | |
| THE CINCINNATI INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

## THE CINCINNATI DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)

_____

Defendant, The Cincinnati Insurance Company, and Improperly Named Defendants, The Cincinnati Casualty Company and The Cincinnati Indemnity Company (collectively with The Cincinnati Insurance Company, unless otherwise stated, "Cincinnati"), by their attorneys, submit herewith this Memorandum In Support Of Their Motion To Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), on the basis that the Plaintiff fails to state a claim upon which relief may be granted.

## INTRODUCTION AND SUMMARY OF ARGUMENTS

The Policy at issue supplies property insurance coverage. It is designed to indemnify loss or damage to property, such as in the case of a fire or storm. Coronavirus (or "COVID-19") does not damage property; it hurts people. Plaintiff demands the Policy's Business Income, Extra Expense, and Civil Authority coverages. But, because they are part of a property insurance policy, these coverages protect Plaintiff only for income losses tied to physical damage to property, not for economic loss caused by governmental or other efforts to protect the public from disease. *See*

*Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F. Supp. 2d 612, 617 (E.D. Va. 1999) (the "direct physical loss" language in the policy provides a further limitation on the types of loss covered). *See also Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 2008-Ohio-311, 884 N.E.2d 1130, ¶ 68 (8th Dist) (Stewart, J.).

The Plaintiff's allegations actually establish that it has not sustained any losses attributable to direct physical loss to property, and thus has not sustained a covered loss under the Policy. Instead, Plaintiff alleges that the pandemic spreads COVID-19 among humans. Moreover, the same direct physical loss requirement applies to all the coverages for which Plaintiff sues. Thus, it applies to the Civil Authority coverage as well as the Business Income and related Extra Expense coverages.

Plaintiff does not sufficiently plead its claim. It merely states labels and conclusions about direct physical loss. But, there must be factual allegations showing direct physical loss and there are none. At bottom, Plaintiff bears the initial burden of showing actual direct physical loss to property. This is always necessary to make a *prima facia* case for property insurance coverage. Because Plaintiff fails to allege direct physical loss, Plaintiff's Complaint should be dismissed.

## ARGUMENT

### I.    BACKGROUND FACTS AND GENERAL INSURANCE LAW PRINCIPLES.

#### A.    Allegations Of The Complaint.

The Complaint includes the following allegations:

- "Plaintiff is the owner and operator of restaurants in Nashville, Tennessee, as well as New York, Pennsylvania and Washington, D.C., who has been forced, by recent orders issued by various cities and states including the City of Nashville and the State of Tennessee, to cease and/or curtail its operations . . . as part of government efforts to address the COVID-19 crisis." (Dkt. No. 1, Compl. at ¶ 1).

2

- Defendants issued Plaintiff "commercial businessowners insurance policies." (Compl. at ¶ 2).[1]

- Plaintiff has been subject to certain "Closure Orders" that have limited the number of people permitted to dine-in at the restaurant, and thereafter limited Plaintiff to providing only delivery and carry-out food and beverage service and prohibited Plaintiff from providing dine-in food and beverage service. Other closure orders required people to stay at home unless engaged in essential activities. (Compl. at ¶¶ 3-7).

- In Nashville and Davidson County, Tennessee, the Metro Health Department "issued a 'Safer at Home Order' closing all dine-in restaurant operations in an effort to mitigate the impact of COVID-19, to bend the curve of new infections and to disrupt the spread of the virus, with the goal of saving lives and reducing strain on local healthcare resources[.]" (Compl. at ¶ 4).

- The Governor of Tennessee issued an Executive Order, "which ordered all Tennesseans to stay home unless engaged in an enumerated essential service/activity to avoid exposure to and the spread of COVID-19." (Compl. at ¶ 5).

- In Washington, D.C., the Mayor issued an Order prohibiting on-site dining "in an effort to slow the community transmission of communicable diseases like COVID-19 by limiting public activities and engaging in social distancing[,]" and "to protect the vulnerable populations during the COVID-19 public health emergency." (Compl. at ¶ 6(a)).

- The Governor of Pennsylvania issued an order requiring "all restaurants and bars to close their dine-in facilities to help stop the spread of COVID-19." (Compl. at ¶ 6(b)).

- The Mayor of New York City signed an Executive Order limiting restaurants and bars to providing take-out or delivery service, "to reduce the number of opportunities for the person-to-person transmission of COVID-19." (Compl. at ¶ 6(c)).

- "Because of the municipal and statewide closures and stay at home orders, the public has been denied access to Plaintiff's restaurants." (Compl. at ¶ 7).

---

[1] In fact, as the Policy attached to the Complaint shows, Plaintiff entered into a single insurance contract with The Cincinnati Insurance Company. The remaining Cincinnati entities are separate entities that have no relationship, contractual or otherwise, with Plaintiff. Accordingly, they are improper parties to this Lawsuit and must be dismissed. (*See* Dkt. No. 1-14, Compl., Ex. A, Policy at p. 13). In any event, as shown, there is no coverage under the Policy for Plaintiff's alleged losses.

3

- Defendants began issuing blanket denials to insureds for any losses related to the Closure Orders, and Cincinnati breached its insurance contract and acted in bad faith by having denied coverage for Plaintiff's COVID-19 related losses. (Compl. at ¶¶ 8 & 55).

- "The Defendants Policies [*sic*] do not exclude losses from viruses or pandemics. Thus, the all-risk Policies purchased by the Plaintiff cover losses caused by viruses, such as COVID-19." (Compl. at ¶ 28).

- "With respect to business interruption losses, 'suspension' means: (1) 'the partial slowdown or complete cessation of your business activities'; or (2) 'that a part or all of the described premises is rendered untenantable if coverage for Business Income applies.'" (Compl. at ¶ 30) (quotations in original).[2]

- "Emerging research on the virus and recent reports from the CDC indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous. Other research indicates that the virus may linger on surfaces for up to four weeks in low temperatures. (Compl. at ¶ 37).

- "The continuous presence of the coronavirus on or around Plaintiff's premises has rendered the premises unsafe and unfit for its intended use and therefore caused physical property damage or loss under the Polic[y]." (Compl. at ¶ 38).

- The Closure Orders "prohibited the public from accessing Plaintiff's restaurant, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Polic[y]," and, "[a]s a result of the Closure Orders, the Plaintiff has suffered substantial Business Income losses and incurred Extra Expense [and] has been forced to furlough its workers and may have to close some or all of its locations permanently." (Compl. at ¶¶ 40-41).

**B.    The Cincinnati Policy.**

    **1.    The Policy And The Coverage.**

The Cincinnati Insurance Company issued a policy of insurance to Pizza Loves Emily

Holdings, LLC, Policy No. EPP 054 76 36, effective from August 15, 2019 to August 15, 2020

---

[2] Contrary to the allegations of the Complaint, the Policy defines "suspension" to mean "slowdown or cessation of your business activities; ***and*** [t]hat a part or all of the 'premises' is rendered untenantable." (*See, e.g.*, Dkt. No. 1-14, pp. 80 & 154) (emphasis added; internal sub-numbering omitted). No facts alleged in the Complaint show the Plaintiff's premises were untenantable. But, even if they were, the Complaint fails as a matter of law because it does not allege physical loss to property caused by the Coronavirus, the Closure Orders, or otherwise.

4

("the Policy").[3] For present purposes, the pertinent parts of the Policy are form FM 101 05 16, and form FA 213 05 16. (Policy at pp. 41-80 & 146-154, respectively). The Building and Personal Property Coverage form, FM 101 05 16, is the main property coverage form. The Business Income (and Extra Expense) Coverage form, FA 213 05 16, addresses business income and extra expense. Using the same language, each form supplies Business Income coverage, Civil Authority coverage, and Extra Expense coverage.

Under Tennessee law, an insurance policy is generally to be interpreted as any other contract. *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). In construing an insurance contract, "the language of the policy should be given its plain and ordinary meaning." *Burdett Oxygen Co. of Cleveland, Inc. v. Employers Surplus Lines Ins. Co.*, 419 F. 2d 247, 248 (6th Cir. 1969). The court must read the insurance contract as a layperson would read it. *Paul v. Ins. Co. of N. Am.*, 675 S.W.2d 481, 484 (Tenn. Ct. App. 1984). Further, "the contract should be read as a whole and each word given its appropriate meaning, if possible." *Burdett Oxygen Co. of Cleveland, Inc.*, 419 F. 2d at 248; *Mid–South Title Ins. Corp. v. Resolution Trust Corp.*, 840 F.Supp. 522, 526 (W.D. Tenn. 1993).

The only issue in this case is whether the losses claimed by Plaintiff fall within the coverage provided by the Policy. Plaintiff, like any claimant under a policy, has the initial burden of proving that a loss comes within the terms of the policy. *Blaine Constr. Corp. v. Ins. Co. of N. Am.*, 171 F. 3d 343, 349 (6th Cir. 1999). The interpretation of an insurance contract is a matter of law to be determined by the court. *Black v. State Farm Mut. Auto. Ins. Co.*, 101 S.W.3d 427, 428 (Tenn. Ct.

---

[3] Plaintiff attached a copy of the Policy to the Complaint. Attachments to the complaint are considered to be part of the complaint. *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011). For brevity, citations to "Policy at p. __" refer to the Dkt. No 1-14. The page numbers correspond to the ECF file-stamped page numbers at the bottom of Dkt. No. 1-14.

5

App. 2002). Thus, the issues in this Motion to Dismiss are particularly appropriate for resolution at this time.

### 2.    The Direct Physical Loss Requirement.

The requirement of "direct physical loss" is a core element in property insurance policies like Plaintiff's. The requirement appears in multiple places. For example, direct physical loss to the Plaintiff's property is required for Business Income coverage:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The suspension must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown on the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(Policy at pp. 58 & 146). The term "loss" is defined to mean ***physical*** loss or physical damage. (Policy at pp. 78 & 154) (emphasis added). Accordingly, direct physical loss is required for Business Income coverage. This requirement is plainly stated throughout the policy and these words are not ambiguous.

### 3.    The Requirement That There Be A Covered Cause Of Loss.

The requirement of direct physical loss additionally appears in the Covered Cause of Loss threshold requirement for any coverage:

> SECTION A. COVERAGE
> We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

(Policy at pp. 43 & 147).

Covered Cause of Loss is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Policy at pp. 45 & 147). As stated, "loss" is defined, in relevant part, as ***physical*** loss or physical damage. (Policy at pp. 78 & 154) (emphasis added). Accordingly, direct physical loss is a necessary element of Covered Cause of Loss. As discussed in more detail below,

6

Civil Authority coverage applies when a "Covered Cause of Loss causes damage to property other than Covered Property at a 'premises'." Therefore, because direct physical loss is an element of Covered Cause of Loss, a Plaintiff must establish direct physical loss in order to meet its burden of establishing that the Civil Authority coverage applies. The same applies to the Extra Expense coverage because it too requires physical loss for the coverage to apply. (Policy at pp. 59 & 148) (emphasis added).

> **4.** **The Presence Or Absence Of Exclusions Is Irrelevant Unless Plaintiff First Establishes That The Loss Falls Within The Terms Of The Coverage.**

Plaintiff points out that the Policy lacks any exclusion explicitly referencing viruses and argues that this is evidence that losses from a virus were intended to be covered. (Compl. at ¶ 28). Not true. The law is clear that the policyholder bears the initial burden of demonstrating the alleged "loss" falls within the policy. *Blaine Constr. Corp.*, 171 F.3d 343 at 349. The presence or absence of an exclusion addressing a specific condition, such as a virus, does not shed any light on whether there has been direct physical loss in the first instance. Exclusions do not create coverage. Rather, exclusions should also be read ad seriatim such that each exclusion reduces coverage and operates independently with reference to the insuring agreement. *Standard Fire Insurance Company v. Chester-O'Donley & Associates, Inc.*, 972 S.W.2d 1, 8 (Tenn. Ct. App. 1998) (applying Kentucky substantive law). *See also, Mastellone,* 175 Ohio App. 3d 23, 2008-Ohio-311, 884 N.E.2d 1130, at ¶¶ 61-69; *and Zinser v. Auto-Owners Ins. Co.*, 12th Dist. Butler No. CA2016-08-144, 2017-Ohio-5668, ¶ 33 (Powell, J., concurring and dissenting in part) ("[S]ince I would find the AC units are not covered property under the policy, any further analysis of the policy's exclusions and limitations is unnecessary.").

### 5. The Requirements Of The Civil Authority Coverage.

In addition to the direct physical loss requirement, Civil Authority coverage requires that an insured suffer actual loss of Business Income caused by the specific actions of a civil authority. This coverage is only provided if all of the following apply:

(a) A *Covered Cause of Loss* caused damage to property other than Covered Property at the insured premises;

(b) *Access* to the insured premises *is prohibited* by civil authority;

(c) *Access* to the area immediately surrounding the damaged property *is prohibited* by civil authority as a result of the damage to other property; and

(d) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the *Covered Cause of Loss* that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Policy at pp. 59 & 147) (emphasis added). Accordingly, Civil Authority coverage requires, among other things, direct physical loss to property other than the insured's property and prohibition of access to the insured's property as a result of that direct physical loss. Plaintiff fails to allege facts to show that any of the elements for Civil Authority coverage are met.

## II. MOTION TO DISMISS STANDARD.

When evaluating a motion to dismiss for failure to state a claim, the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *D'Ambrosio v. Marino*, 747 F. 3d 378, 383 (6th Cir. 2014) (quoting *Terry v. Tyson Farms, Inc.*, 604 F. 3d 272, 275–76 (6th Cir. 2010)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and

8

conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (*quoting Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F. 3d 239, 246–47 (6th Cir. 2012)). Stated differently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted).

In addition, the defendant may also rely on the exhibits attached by the plaintiff to the complaint when evaluating a motion to dismiss to show the plaintiff is not entitled to relief. *Rondigo, LLC v. Township of Richmond*, 641 F. 3d 673, 681 (6th Cir. 2011). Specifically, the court can consider insurance policies attached to or referenced in the complaint when ruling on a Rule 12(b)(6) motion. *Valley Creek Land & Timber v. Colonial Pipeline Co.*, 432 F.Supp.3d 1360, 1363 (11th Cir. 2020). Considering documents that are central to the complaint does not change a motion to dismiss into a motion for summary judgment when the documents are undisputed in their authenticity. *Id*. In this case, therefore, the court can and should consider the Closure Orders and the Policy attached to the complaint, because they are central to the complaint and their contents and authenticity are not in dispute.

Where the Complaint's allegations are in conflict with the terms of the Policy and the Closure Orders, the terms of the Policy and the Closure Orders control. *See, e.g*., 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (collecting cases).

In deciding a 12(b)(6) motion, courts have said that they accept the truth of "facts," "material facts," "well-pleaded facts," and "well-pleaded allegations," but they do not accept "legal conclusions," "unsupported conclusions" or "sweeping legal conclusions cast in the form of factual allegations." 5A WRIGHT & MILLER, supra note 3, § 1357, at 311-318. These standards are important as applied to this case, because as discussed below, Plaintiff has not adequately alleged direct physical loss. Thus, the principles articulated in *Iqbal, Twombly, Blaine, D'Ambrosio, Republic Bank* and WRIGHT & MILER are not fulfilled. Plaintiff glosses over the necessary requirement of direct physical loss by pleading unsupported, sweeping conclusions. These conclusions do not "move the needle" and should be ignored.

## III. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE IT DOES NOT ALLEGE DIRECT PHYSICAL LOSS.

### A. The Complaint Does Not Allege Direct Physical Loss To Plaintiff's Premises.

Plaintiff does not allege facts showing any direct physical loss. The alleged facts simply do not show direct physical loss. There are no allegations of a physical or structural alteration of Plaintiff's property. Rather, the Complaint alleges only "threadbare recitals" and "formulaic recitations." This is woefully insufficient given the pleading requirements mandated in cases like *Twombly* and *Iqbal*. Since Plaintiff does not allege any facts that sustain the claim, it cannot possibly prove its claim. *See Mastellone,* 175 Ohio App.3d 23, 2008-Ohio-311, 884 N.E.2d 1130, at ¶ 68.

*Mastellone*, is very close, factually, to the present case. The relevant policy language in *Mastellone* was the same as that in the Cincinnati Policy. It too required "direct physical loss," also referred to in *Mastellone* as physical injury to property. *Id.* at ¶¶ 61-62. *Mastellone* holds that mold on building siding did not constitute physical injury because it did not adversely affect the building's structural integrity. In this context, *Mastellone* rejected the argument that dark staining

on the siding was physical injury, because the staining was "only temporary and did not affect the structure of the wood." The mold could be removed via cleaning, and its presence "did not alter or otherwise affect the structural integrity of the siding." *Id.* at ¶¶ 61-69. *Mastellone* relies on a leading insurance treatise: "[t]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property". 10A *Couch on Ins.* § 148:46 (3d Ed.1998). Accordingly, the *Mastellone* court found there was no coverage.

Here, the supposed presence of COVID-19 did not affect the structural integrity of the property. The loss Plaintiff alleges is caused by the presence of the virus in our world, not by any physical damage or effect on Plaintiff's building or someone else's property. Indeed, the Complaint admits that premises where the virus has been confirmed to be present, such as hospitals and nursing homes, have remained open. (See, e.g., Dkt. No. 1-3, p. 3; Dkt. No. 1-4, p. 7; Dkt. No. 1-5, pp. 3-4). These properties remain open because, like Plaintiff's premises in this case, they are themselves undamaged.

Moreover, even if COVID-19 could cause direct physical loss to the premises, which it cannot, Plaintiff again makes only "labels and conclusions" and "conclusory allegations" that COVID-19 was ever on its premises at all. The only time the Complaint asserts that COVID-19 was ever on Plaintiff's premises is in Paragraph 38, which alleges "[t]he continuous presence of the coronavirus on or around Plaintiff's premises has rendered the premises unsafe and unfit for its intended use and therefore caused physical property damage or loss under the Polic[y]." (Compl. at ¶ 38). The vague, amorphous and non-specific reference to "the continuous presence

of the coronavirus *on or around* Plaintiff's premises" constitutes an "unwarranted factual inference," a "formulaic recitation of the elements of [Plaintiff's] cause of action," and a "[t]hreadbare recital of the elements of a cause of action, supported by mere conclusory statements" -- all in violation of *Iqbal*, *Twombly* and *D'Ambrosio*. To satisfy the well-established pleading requirements of these cases, Plaintiff must plead the factual basis for its assertion that COVID-19 is *on or around* Plaintiff's premises". Plaintiff has not done so. The Court should accordingly dismiss Plaintiff's Complaint on the basis that, even assuming that COVID-19 causes direct physical loss, Plaintiff has not adequately pleaded it was ever on Plaintiff's premises to begin with.

Moreover, even if present on Plaintiff's premises, the Complaint admits that, like the mold in *Mastellone*, the Centers for Disease Control (CDC) recognizes that COVID-19 can be removed by cleaning affected surfaces. "WHEREAS" Plaintiff admits, "the CDC advises that . . . the following health guidelines . . . should be followed: (2) . . . disinfecting frequently used items and surfaces as much as possible." (*See, e.g.*, Dkt. No. 1-4, p. 2). For this reason, Plaintiff further admits that "essential businesses" that are not subject to the Closure Orders include companies providing supplies for essential business operations, including "chemicals, soaps, and detergent (Dkt. No. 1-4, pp. 10-11, ¶ 20), and "non-grocery products and products necessary to maintaining . . . sanitation." (Dkt. No. 1-4, pp. 10-11, ¶ 6). These admissions are consistent with the position of the CDC, which has instructed that the Coronavirus can be wiped off surfaces by cleaning: "The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes." *See* CDC Reopening Guidance for Cleaning and Disinfecting (4/28/2020), attached hereto as Ex. A; *See also* CDC, *Cleaning and Disinfection for Households*,

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html

(accessed July 9, 2020).[4]

Thus, as in *Mastellone*, even if Plaintiff had alleged there is actual presence of the Coronavirus on the surfaces of Plaintiff's restaurant, the Complaint fails to allege direct physical loss. The Complaint admits the virus either dies naturally in days, or it can be wiped away. Thus, the Complaint's allegations fall squarely within *Mastellone*'s holding that an organic substance on a surface is not direct physical loss as a matter of law when it can be wiped away. And here, if not wiped away, the virus dies naturally within hours or days. Stated differently, the Complaint makes "threadbare recitals" and "formulaic recitations" of direct physical loss *in violation of* the pleading requirements articulated in *Twombly* and *Iqbal*, but it fails to allege facts that "raise a right to relief" and "state a plausible claim for relief" *as required by Twombly* and *Iqbal*. In essence, the Complaint seeks recovery for the presence of a cleanable organic substance that *Mastellone* holds is not direct physical loss as a matter of law. As discussed in the following paragraphs, *Mastellone* does not stand alone in this regard.

Furthermore, the Complaint "dances around" the direct physical loss issue. It does not assert damage to the structural integrity of the property. Instead, it asserts that the "physical closing and/or inability of Plaintiff to open due to the Closure Orders . . . constitutes a physical loss so as to entitle it to coverage under the policy." (Compl. at ¶ 11). Plaintiff does not allege a direct physical loss that would "raise a right to relief" and "state a plausible claim for relief" as required by *Twombly* and *Iqbal*. Direct physical loss is not, as a matter of law, established by an organic

---

[4] "[I]f a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425 (6th Cir. 2018).

substance that allegedly is "on or about" the property, that allegedly denies use of the property or that causes a suspension of operations at the property. In the final analysis, the Complaint does not allege direct physical loss, and consequently there is no Business Income coverage.

### B. American Case Law Is Overwhelmingly Consistent With Cincinnati's Position Here.

No case, in Tennessee, or elsewhere, has held that a virus constitutes direct physical loss. By contrast, *Mastellone* is not alone in holding that direct physical loss requires actual, tangible, permanent, physical alteration of property. *See, e.g.*, 10A *Couch on Ins.* § 148:46 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, ***is widely held*** to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (emphasis added).

*Source Food Technology, Inc. v. U.S. Fidelity & Guarantee Co.,* 465 F. 3d 834, 838 (8th Cir. 2006) (Minn.), is one of many cases that is to the same effect as *Mastellone*. There, the U.S. government imposed an embargo on the import of Canadian beef following the detection of Mad Cow Disease in Canadian cattle. Despite no evidence that *its* beef was contaminated, Source Food could not import it into the U.S. because of the embargo. It claimed lost business income under its insurance policy, which, like the policy here, provided coverage if the suspension of business operations was "caused by ***direct physical loss to Property***". *Id.* at 835. Source Food argued "that the closing of the border caused direct physical loss to its beef product because the beef product was treated as though it were physically contaminated by mad cow disease and lost its function." *Id.* at 836. *Source Food* rejects this argument: "To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as

14

direct physical loss to property," the court held, "would render the word 'physical' meaningless." *Id.* at 838. In essence, the loss of the opportunity to use property does not render the property itself damaged, broken, dysfunctional or incapable of being used.

Similarly, *Philadelphia Parking Authority v. Federal Insurance Co.,* 385 F.Supp.2d 280, 289 (S.D.N.Y. 2005), holds that there was no direct physical loss to an airport parking facility that had to close on September 11, 2001 due to the terrorist attacks. *See also Pentair, Inc. v. Am. Guar. & Liab. Ins. Co.*, 400 F. 3d 613, 616 (8th Cir. 2005); *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F. 3d 38, 44 (2d Cir. 2003); *N.E. Ga. Heart Ctr., P.C. v. Phoenix Ins. Co.*, 2014 WL 12480022, at *7 (N.D. Ga. May 23, 2014); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 780 (2010).

Furthermore, *Mastellone* states a majority view with its holding that where property can be cleaned, it is not physically damaged. *See, e.g.*, *Mama Jo's, Inc. v. Sparta Ins. Co.,* 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[w]ith regards to Plaintiff's initial claim for cleaning, cleaning is not considered direct physical loss."); *Universal Image Prods., Inc. v. Chubb Corp.*, 703 F.Supp.2d 705, 710 (E.D. Mich. 2010) (a complete cleaning of a ventilation system was not a direct physical loss), *aff'd*, 475 Fed.Appx. 569 (6th Cir. 2012). *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15, *infra*.

In sum, the cases nationally demonstrate that the presence of the virus in the community is not direct physical loss to property.

### C. Tennessee Law Is Consistent With *Mastellone* And The Cases Nationally.

Tennessee cases are consistent with the law nationally, such as *Mastellone*. The phrase "direct physical" modifies <u>both</u> the terms "loss of" and "damage to" covered property. *S.E. Mental Health Ctr., Inc. v. P. Ins. Co., Ltd.*, 439 F.Supp.2d 831, 837 (W.D. Tenn. 2006). Thus, whether

15

the Court is considering whether there has been a "loss of" covered property, such consideration must focus on the "physical" nature of the loss. In addition, the word "direct" indicates "'immediate' or 'proximate' cause, as distinct from remote or incidental causes." *Universal Image Productions, Inc. v. Fed. Ins. Co*., 475 Fed. Appx. 569, 573 (6th Cir. 2012).

The term "physical" means "pertaining to real, tangible objects." *Black's Law Dictionary* (11th ed. 2019). In the insurance context, the "requirement that the loss be 'physical,'" is "widely held" to "preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A Steven Plitt, *et al*. *Couch on Insurance* § 148:46 (3d ed. 1995). As shown, there is no Tennessee case addressing whether the presence of a virus is direct physical loss. But, the proposition that there must be a "distinct, demonstrable, physical alteration" prevails in many jurisdictions. *See e.g., Universal Image Prods., Inc*., 475 Fed. Appx. at 573 (requirement of "direct physical loss" not met where presence of bacteria in air conditioning system did not cause tangible damage to insured premises); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co*., 115 Cal. Rptr. 3d 27, 37 (Cal. App. 2d Dist. 2010) ("A direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'", *citing and quoting AFLAC Inc. v. Chubb & Sons, Inc.* (2003) 260 Ga. App. 306, 581 S.E.2d 317, 319.

Indeed, emerging decisions concerning recent claims similar to Plaintiff's show that there is no physical loss or physical damage as required for coverage under similarly worded policies. They hold that the Coronavirus and related closure orders do ***not*** cause "physical," i.e., actual, tangible, structural, loss or damage to property. *See, e.g., Gavrilides Management Company et al.*

16

*vs. Michigan Insurance Company*, Case No. 20-258-CB-C30 (Ingham County) ("Direct physical loss of or damage to the property "has to be something with material existence. Something that is tangible. Something . . . that alters the physical integrity of property."); *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15 (the Coronavirus damages lungs; not printing presses).[5]

Here, as in the precedents Cincinnati relies on, there was no direct physical loss. Thus there can be no Business Income or Extra Expense coverage here.

### D. Plaintiff's Arguments Concerning The Virus Exclusion Fail Because There Is No Direct Physical Loss.

Plaintiff claims that coverage exists because the Policy does not contain a virus exclusion. Plaintiff is legally incorrect. As established, the insured policyholder bears the initial burden of demonstrating the alleged "loss" falls within the policy. *Blaine Constr. Corp.*, 171 F. 3d at 349. That means that in this case Plaintiff must plead and prove that it incurred direct physical loss to property at its premises. An exclusion can theoretically become relevant only if Plaintiff first meets its burden of showing that there is direct physical loss. As established, Plaintiff cannot do so. Thus, Plaintiff cannot fulfill the threshold requirement of a direct physical loss.

The basic principle that a direct physical loss must be established before an exclusion can even be pertinent is well-established in the law. *See e.g. Hartford Life & Acc. Ins. Co.*, 2006 WL 2801878, *13 (M.D. Fla. 2006)( "[u]pon a finding that McClurg's death was not a loss covered by the policy, it is unnecessary for the court to determine whether the intoxication exclusion applies

---

[5] No written opinions have been issued in *Gavrilides Management Company* and *Social Life* at the time of filing this brief. The oral arguments and the Court's oral ruling in *Gavrilides* are available for viewing on YouTube: https://www.youtube.com/watch?v=Dsy4pA5NoPw&feature=youtu.be. A copy of the hearing transcript is also attached for the Court's convenience as Exhibit B. A copy of the hearing transcript in *Social Life* is available through the Federal Court's filing system, PACER, and is attached for the Court's convenience as Exhibit C.

to exclude coverage."); *Buce v. Allianz Life. Ins. Co.,* 247 F. 3d 1133, 1149, f/n 7 (11th Cir. 2001); *Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co*., 114 Cal. App. 4th 548, 555, f/n 5, 7 Cal. Rptr. 3d 844, 850 (2003); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.,* 17 F. Supp. 3d 323, 333 (S.D.N.Y. 2014); *Roundabout Theatre Co. v. Cont'l Cas. Co*., 302 A.D.2d 1, 9, 751 N.Y.S.2d 4, 10 (2002); *Zinser v. Auto-Owners Ins. Co.,* 2017-Ohio-5668, ¶ 33 (Ohio App.). Thus, in *Ward Gen.*, a law firm closed because of a power outage. The loss of power was not a direct physical loss. *Ward Gen.*, 114 Cal. App.4th at 555. Because there was no direct physical loss, it was unnecessary to decide whether a flood exclusion applied. Similarly, in *Newman*, there was a database crash. There was no direct physical loss. Therefore, it was "unnecessary to analyze the various exclusions and their application to this case." *Newman,* 14 F. Supp.3d at 9.

In sum, there is no coverage here because there is no direct physical loss. For that reason, no exclusion is needed.

## IV.     THERE IS NO CIVIL AUTHORITY COVERAGE.

### A.      The Allegations Of The Complaint Fail To Satisfy The Civil Authority Coverage.

As established, the Policy's Civil Authority coverage only applies if there is a Covered Cause of Loss, meaning direct physical loss that is not excluded or limited, to property other than the Plaintiff's property. Even then, there is only Civil Authority coverage if additional requirements are met. Even then, there is only Civil Authority coverage if, among other things, the action of the civil authority prohibits access to the insured premises. (Policy at pp. 59 & 147) "[L]osses due to curfew and other such restrictions are not generally recoverable. * * * If a policy provides for business interruption coverage where access to an insured's property is denied by order of civil authority, access to the property must actually be specifically prohibited by civil order, not just made more difficult or less desirable." 11A *Couch on Ins.* § 167:15.

18

**B.    There Is No Direct Physical Loss To Other Property Even Alleged.**

Cincinnati has demonstrated that direct physical loss to property other than the Plaintiff's property is necessary. Courts nationwide have upheld that requirement. *See Paradies Shops, Inc. v. Hartford Fire Ins. Co.*, 2004 WL 5704715, at *1-2, *6 (N.D. Ga. Dec. 15, 2004) (holding that there was no coverage in part because the FAA's order that grounded planes after September 11th was not a "direct result" of property damage); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.,* 2020 WL 886120, 8 (D.S.C. Feb. 24, 2020); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.,* 2011 WL 13214381, 6 (E.D. Tex. Mar. 30, 2011); *S. Texas Med. Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, 10 (S.D. Tex. Feb. 15, 2008); *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 131 (2d Cir. 2006).

Just as COVID-19 is not causing direct physical loss to Plaintiff's premises, it is not causing direct physical loss to other property. The Complaint fails to identify any distinct, demonstrable, physical alteration of property, anywhere. Rather, it alleges COVID-19 and related Closure Orders have required its business to cease or reduce operations. No facts are alleged that demonstrate that these things happened because of direct physical loss to anybody's property. This fails to meet the standard set in *D'Ambrosio*, *Twombly* and *Iqbal*. Instead, as Plaintiff admits, the closing or limiting of business operations protected the public from human to human transmission of the virus: The orders closed all dine-in restaurant operations "in an effort to mitigate the impact of COVID-19, to bend the curve of new infections and to disrupt the spread of the virus, with the goal of saving lives and reducing strain on local healthcare resources[.]" (Compl. at ¶ 4; *and see* Compl. at ¶¶ 5-6 (same)).

There are no alleged facts showing any direct physical loss anywhere. There are no alleged facts showing any change or alteration of anybody's physical property. There are, however, as

admitted in the Complaint, facts showing that COVID-19 can be removed via cleaning. As established, this is the marker of something that is *not* direct physical loss. Accordingly, there is no direct physical loss to any other property as is required for Civil Authority coverage.

### C. The Complaint Fails To Allege The Requisite Prohibition of Access Necessary For The Civil Authority Coverage To Apply.

The Civil Authority coverage requires that access to Plaintiff's premises be prohibited by an order of Civil Authority. But, as Plaintiff admits, none of the government orders alleged in Plaintiff's Complaint "prohibit" access to its premises. The Civil Authority clause addresses the prohibition of access, not of use. *See Davidson Hotel Co. v. St. Paul Fire and Marine Ins. Co.*, 136 F.Supp.2d 901, 912 (W.D. Tenn. 2001). While there is no Tennessee precedent discussing the "Civil Authority" clause, cases across the country recognize that this language is not triggered where a policyholder's premises is only rendered less accessible but not fully "prohibited." *See S. Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F. 3d 1137, 1139-41 (10th Cir. 2004). In *S. Hospitality*, the grounding of flights after September 11th made it more difficult for customers to access plaintiff's hotels but did not "prohibit access" to them. Accordingly, there was no civil authority coverage. *S. Hospitality*, 393 F. 3d at 1139.

To the same effect is *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, 2007 WL 2489711, at *4–5 (M.D. La. Aug. 29, 2007). *Kean, Miller* holds that there was no civil authority coverage where the insured closed its business as the result of actions by civil authorities related to Hurricane Katrina coming ashore.

> [T]he Court located several cases from other jurisdictions, and in each of those cases, the court determined that the [Civil Authority Clause] at issue was unambiguous and further held that coverage did not exist under such a clause unless the action of civil authority *actually* and *completely* prohibited access to the insured premises. For example, in *Southern Hospitality, Inc. v. Zurich American Ins.*, 393 F. 3d 1137 (10th Cir.2004), certain insured hotel operators brought suit against their insurer for denying their claims for loss of business income sustained

when customers of their hotels canceled visits due to cancellation of airline flights by the Federal Aviation Administration ("FAA") in the wake of the 9/11 attack. The hotel operators relied upon an identical Civil Authority Clause to that in the present case. The court held that there was no dispute that the FAA's order prohibiting the flying of airplanes qualified as an "action of civil authority." However, even though the order stopped the flying of airplanes, it did not "prohibit access" to hotel operations. The court explained that the plain and ordinary meaning of the phrase "prohibits access" is to "formally forbid, esp. by authority" or to "prevent." Thus, in order for the Civil Authority Provision to apply to the hotel operations, it would have to formally and directly forbid or prevent those operations, rather than tangentially affect them. In other words, the court determined that there must be a "direct nexus" between the civil authority order/action and the suspension of the insured's business for the Civil Authority Provision to apply, and because the FAA's order grounding flights did not itself "prevent, bar, or hinder access to" the plaintiff's hotels, coverage did not exist.

*Kean, Miller,* 2007 WL 2489711, at *4–5 (emphasis added).

While the Complaint alleges that "the March 30, 2020 Order prohibited the public from accessing Plaintiff's restaurant, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Polic[y]," this allegation is inconsistent with the terms of the Closure Orders themselves and with Plaintiff's affirmative allegations that show the Closure Orders permitted Plaintiff's premises to remain open and accessible for food preparation, take-out, and delivery services. (*See* Compl. at ¶ 40; *but see* Compl. at ¶¶ 4-6). As discussed, where, as here, the Complaint's allegations are in conflict with the terms of the Policy and the Closure Orders, the terms of the Policy and the Closure Orders control. *See, e.g*., 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller). By attaching the Closure Orders to the Complaint, Plaintiff admits that the Closure Orders did not prohibit the public or Plaintiff from accessing to the establishment. Likewise, Plaintiff admits it could offer drive-through, pickup, carry-out, or delivery service for food or drink. (Compl. at ¶¶ 4-6). Plaintiff could also perform the "minimum necessary activities required to maintain any business or organization." (*See, e.g.*, Dkt. No. 1-4, p. 12, ¶ 30). Thus, because

Plaintiff could still access the premises, coverage under the "Civil Authority" provision is not triggered. Therefore, Plaintiff has failed to state a claim to which it is entitled to relief and this Court should grant the Motion to Dismiss.

Similarly, there is no Civil Authority coverage when the government order keeps people confined to their homes. *See Syufy Enters. v. Home Ins. Co. of Ind.*, 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995); *Brothers, Inc. v. Liberty Mut. Fire Ins. Co.,* 268 A.2d 611, 614 (D.C. 1970). In *Syufy*, there was a curfew to prevent rioting. Still, there was no civil authority coverage because access to the insured premises, a movie theater, was not prohibited. In *Brothers*, a curfew was ordered because of riots. However, although the curfew prevented a restaurant's customers from being out and about, it did not prohibit access to the restaurant's premises. The curfew orders in *Syufy* and *Brothers, Inc.* are analogous to the stay at home order issued in Tennessee.

Furthermore, access to premises must be prohibited, not just limited, as for example, access being limited to carry out food and beverage service in this case. *See Schultz Furriers, Inc. v Travelers Cas. Ins. Co. of Am.*, 2015 WL 13547667, at *6 (N.J. Super. L. July 24, 2015); *Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 WL 2696782, at *4 (M.D. Pa. July 6, 2010). In *Schultz*, there were serious traffic issues in lower Manhattan following Superstorm Sandy. Nevertheless, there was no civil authority coverage because it was not completely impossible for the public to access the insured store. In *Ski Shawnee*, a bridge repair hindered or dissuaded the majority of customers from visiting a ski resort. *Ski Shawnee* holds that did not constitute prohibition of access to the premises. *See also Goldstein v Trumbull Ins. Co*., 2016 WL 1324197, at *12 (N.Y. Sup. Ct. Apr. 05, 2016); *TMC Stores, Inc. v. Federated Mut. Ins. Co*., 2005 WL 1331700, at *4 (Minn. Ct. App. June 7, 2005).

22

Because the Complaint's allegations establish access was not prohibited, the Civil Authority coverage does not apply. Therefore, Plaintiff has failed to state a claim to which it is entitled to relief and this Court should grant the Motion to Dismiss.

## CONCLUSION

For the reasons established above, Cincinnati respectfully requests that its Motion to Dismiss be granted.

Dated this [15th] day of July, 2020.

Respectfully submitted,


_s/ Curtis L. Campbell_____
**PARKS T. CHASTAIN**
Registration No. 13744
DIRECT: (615) 630-7717
(615) 256-8787, Ext. 114
pchastain@bkblaw.com
**E. JASON FERRELL**
Registration No. 24425
DIRECT: (615) 630-7716
(615) 256-8787, Ext. 116
jferrell@bkblaw.com
**CURTIS L. CAMPBELL**
Registration No. 37515
DIRECT: (615) 630-7715
(615) 256-8787, Ext. 115
ccampbell@bkblaw.com
Attorneys for the Defendants, The Cincinnati Insurance Company, The Cincinnati Casualty Company, and The Cincinnati Indemnity Company

**BREWER, KRAUSE, BROOKS & CHASTAIN, PLLC**
545 Mainstream Drive, Suite 101
Nashville, TN 37228

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July 2020, a true and correct copy of the foregoing THE CINCINNATI DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO

23

DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6) was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

T. Roe Frazer II, Esquire
Patrick D. McMurtray, Esquire
Thomas Roe Frazer III, Esquire
Frazer, PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215

_s/ Curtis L. Campbell_
**CURTIS L. CAMPBELL**

CLC: