IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PIZZA LOVES EMILY HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY, *et. al*,<br><br>Defendants. | NO. 3:20-cv-00429<br><br>JUDGE CAMPBELL<br>MAGISTRATE JUDGE NEWBERN |

## MEMORANDUM

Pending before the Court is Defendants' Motion to Dismiss. (Doc. No. 29). Plaintiff filed a response (Doc. No. 34) and Defendants filed a reply (Doc. No. 36). The parties filed a Joint Notice of Supplemental Authority (Doc. No. 41), and Defendants filed an additional Notice of Supplemental Authority (Doc. No. 42).

For the reasons stated below, Defendants' motion will be GRANTED.

### I.     BACKGROUND

Plaintiff Pizza Loves Emily Holdings, LLC ("Pizza Loves Emily") operates restaurants in in Nashville, Tennessee, as well as New York, Pennsylvania, and Washington, D.C. Pizza Loves Emily purchased a commercial property insurance policy (the "Policy") from Defendant The Cincinnati Insurance Company ("Cincinnati").[1] This case arises out of Pizza Loves Emily's claims under the policy for lost business income.

---

[1] Plaintiff names three Cincinnati entities as defendants: The Cincinnati Insurance Company, The Cincinnati Casualty Company, and the Cincinnati Indemnity Company. (*See* Doc. No. 1). It appears from the policy Document attached to the Complaint, that the Policy was issued by The Cincinnati Insurance Company. (*See* Doc. No. 1-14). However, correspondence from the company includes the names of all

Pizza Loves Emily states that it was forced to "cease and/or curtail operations" as part of government efforts to address the COVID-19 crisis. In March 2020, as part of efforts to mitigate the impact of COVID-19 and protect the public health, the state and local governments of Nashville, Tennessee, Washington, D.C., Pennsylvania, and New York issued a series of orders designed to prevent the person-to-person spread of COVID-19 (the "COVID Orders").[2] Though the details and duration of the orders varied, the COVID Orders universally required restaurants to close for on-premises eating and drinking and to provide only carry out, delivery, curb-side pick-up, and similar options.

Pizza Loves Emily alleges the COVID Orders required it to close its premises to in-person dining, resulting in lost revenue and furlough or lay off of the majority of its employees. (Compl., Doc. No. 1, ¶¶ 3-7). Pizza Loves Emily seeks insurance coverage under two policy provisions that provide coverage for loss of business income – a provision specifically for "Business Income and Extra Expenses" and the "Civil Authority" provision.

---

three entities. (*See e.g.*, Doc. No. 1-13). For ease of reference, the Court refers to the Defendants collectively in the singular as "Cincinnati."

[2]     Plaintiff attached the following orders to the Complaint: Amended and Restated Order 1, Chief Medical Director, Metro Public Health Department of Nashville and Davidson County, March 20, 2020 (Doc. No. 1-2); Amended and Restated Order 3, Chief Medical Director, Metro Public Health Department of Nashville and Davidson County, April 1, 2020 (Doc. No. 1-3); Executive Order No. 22 , Governor of Tennessee, March 30, 2020 (Doc. No. 1-4); Mayor's Order 2020-053, Government of the District of Columbia, March 24, 2020 (Doc. No. 1-5); Mayor's Order 2020-063, Government of the District of Columbia, April 15, 2020 (Doc. No. 1-6); Order of the Governor of the Commonwealth of Pennsylvania for Limited Opening of Businesses, Lifting of Stay at Home Requirements, and Continued Aggressive Mitigation Efforts, May 8, 2020 (Doc. No. 1-7); Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home, April 6, 2020 (Doc. No. 1-8); Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus (COVID-19), Order No. 2, Office of the Mayor, City of Philadelphia, March 22, 2020 (Doc. No. 1-10); Executive Order No. 202.31 Continuing Temporary Suspension and Modification of Laws Relating to Disaster Emergency, Governor of New York, , May 14, 2020 (Doc. No. 1-11); Emergency Executive Order No. 100, Office of the Mayor, City of New York, March 16, 2020 (Doc. No. 1-12).

The provision for Business Income and Extra Expenses provides:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.
>
> …
>
> We will pay Extra Expense you sustain during the "period of restoration." Extra expense means necessary expenses you sustain … during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

(Policy, Doc. No. 1-14 at PageID# 151-52).

The Policy defines several of these terms:

> Covered Cause of Loss means direct "loss" unless the "loss" is excluded or limited in this Covered Part …
>
> "Loss" means accidental physical loss or accidental physical damage"
>
> "Period of restoration" means the period of time that:
>
> (a) Begins at the time of direct "loss"
>
> (b) Ends on the earlier of:
>
> (1) The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>
> (2) The date when business is resumed at a new permanent location.

(*Id*. at PageID# 138, 171-72).

The Civil Authority provision provides:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

3

> > (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> > (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property …

(*Id*. at PageID# 152).

Though it did not immediately deny the claim, Cincinnati sent Pizza Loves Emily a "Reservation of Rights" letter, which Pizza Loves Emily contends constitutes a "*de facto* denial" of the claims. (Doc. No. 1-13; Compl., ¶ 43). The letter advises that business income coverage under the policy requires "direct physical loss or damage" to covered property, meaning a "physical effect … such as a deformation, permanent change in physical appearance or other manifestation of a physical effect" and concludes, "the fact of the pandemic, without more, is not direct physical loss to property at the premises." (Doc. No. 1-13 at 2 and 5). The letter further advises that Civil Authority coverage under the policy is limited to circumstances in which there is damage to property other than the covered property and access to the area immediately surrounding the other damaged property is prohibited by civil authority in response to dangerous physical conditions resulting from the damage to the other property. (*Id*. at 5-7).

Pizza Loves Emily filed claims for declaratory judgment (Count I) and breach of contract (Count II). Pizza Loves Emily claims that Cincinnati wrongfully denied coverage, and that the inability to provide in-person dining constitutes a "direct physical loss" and that the presence of COVID-19 coronavirus in the covered properties constitutes "direct physical loss or damage." (Compl., ¶ 11).

Defendants moved to dismiss on grounds that the unambiguous terms of the Policy preclude coverage.

4

## II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to Defendant's motion to dismiss provided they are referred to in the Complaint and are central to the claims. *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008). Here, the Court has considered the insurance policy as well as the various COVID Orders, which are attached to the Complaint and central to the claims.

## III. ANALYSIS

In a diversity action, the Court applies the choice of law rules of the forum state. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). "In Tennessee, absent a valid choice of law provision, the rights and obligations under an insurance policy are governed by the law of the state where the insurance policy was 'made and delivered.'" *Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 485 n.1 (Tenn. Ct. App. 2006). The Complaint alleges the Policy was issued to Pizza Loves Emily at its principle place of business in Tennessee and the parties appear to agree Tennessee law applies. (*See* Compl., ¶ 25).

Under Tennessee law, "an insurance policy is a contract, and as such, [the court's] analysis must be grounded in principles of contract law." *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn. 2005). Thus, the terms of an insurance contract "should be given their plain and ordinary meaning." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012). Where the language of the policy is clear and unambiguous, the court must give effect to that meaning. *Id*. The policy must be construed "as a whole in a reasonable and logical manner" and the language "should be examined in the context of the entire agreement." *Id.*

"Language in an insurance policy is ambiguous if it is susceptible of more than one reasonable interpretation." *Artist Bldg. Parters v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013) (citing *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993)). "Ambiguity in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one." *Id*. (quoting *Mid-Century Ins. Co. v. Williams*, 174 S.W.3d 230, 240 (Tenn. Ct. App. 2005)). "When a provision that purports to limit insurance is ambiguous, it must be construed against the insurance company and in favor of the insured." *Id*. (quoting *Gates v. State Auto Mut. Ins. Co.*, 196 S.W.3d 761, 764 (Tenn. Ct. App. 2005)).

Pizza Loves Emily argues it is entitled to coverage for business income loss under policy provisions for "Business Income and Extra Expense" and "Civil Authority." The Court will examine each in turn.

**A. Business Income and Extra Expense Coverage**

The policy provides coverage for loss of business income due to the "'suspension' of your 'operations'" caused by a "direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." (Policy, Doc. No. 1-14 at PageID# 151-52). Defendant argues that coverage under the business income and extra expense provision requires a direct physical loss or

direct physical damage to the properties and that Pizza Loves Emily has not alleged direct physical loss or damage.

There is no dispute that Plaintiff suspended operations. The dispute is whether the suspension was caused by a "direct 'loss' to property." The Policy defines "loss" as "accidental physical loss or accidental physical damage." (Policy, Doc. No. 1-14 at PageID# 171). Incorporating this definition into the policy provision for lost business income, the provision requires that the insured suspended business operations because of a "direct accidental physical loss to property or accidental physical damage to property." "Loss" is not further defined in the policy; neither is "physical loss" or "physical damage."

Plaintiff proposes two theories of how it suffered direct physical loss or direct physical damage. First, Plaintiff contends that "direct physical loss" includes loss of the use of the property for its intended purpose of on premises dining and the associated loss of use of tables, chairs, utensils, drinkware, etc., for their intended purpose. Second, Plaintiff argues that the physical presence of COVID-19 in the restaurant constitutes direct physical damage to the premises.

1. Loss of Use

Plaintiff argues that the phrase "direct accidental physical loss or accidental physical damage to property" includes loss of use of property or, at a minimum, is ambiguous because it does not define "loss," "physical," or "damage." Plaintiff relies upon various definitions of the word "loss." *Webster's* dictionary defines "loss" to include: "destruction," "ruin," "the act of losing possession," and "the amount of an insured's financial detriment by death or damage that the insurer is liable for." (Doc. No. 34 at 11 (citing *Merriam-Webster*, Definition of "Loss," www.merriam-webster.com/dictionary/loss)). Plaintiff cites *Black's Law Dictionary*, which states that "'loss' is 'not a word of limited, hard and fast meaning'" and in common usage in insurance

7

policies "means a state of fact of being lost or destroyed, ruin, or destruction."[3] *Black's Law Dictionary* (6th ed. 1990). The same edition of *Black's* also states "loss" may mean "depletion or destruction of value; deprivation; destruction" or "that which is gone and cannot be recovered or that which is withheld or that of which a party is dispossessed." (*Id.*). Plaintiff also cites The National Association of Insurance Commissioners and the Center for Insurance Policy and Research, which defines "loss" as "physical damage to property or bodily injury, including loss of use or loss of income" (Doc. No. 34 at 11 (citing www.naic.org/consumer_glossary.htm)).

Plaintiff also notes that "physical" is defined by *Webster's* as "having material existence: perceptible especially through the senses and subject to the laws of nature; of or relating to material things." (*Id.* (citing *Merriam-Webster*, Definition of "Physical," www.merriam-webster.com/dictionary/physical)).

After citing these definitions, without connecting "loss" to the modifying adjective "physical," Plaintiff summarily concludes that "[t]he average business entity purchasing the Cincinnati Policy would understanding the insuring language to cover the loss of access and functionality of the covered property, a restaurant, as a *physical loss or damage to* property." (Doc. No. 34 at 12 (emphasis in original)). Plaintiff argues that, at a minimum, the policy language is ambiguous, and the ambiguity must be resolved in Plaintiff's favor. (*Id.* at 13).

As a threshold matter, the Court disagrees that the phrase "physical loss or damage to property" is ambiguous. *See Stonebridge Life Ins. Co. v. Horne*, No. W-2012-00515-COA-R3-CV, 2012 WL 5870386, at *5 (Tenn. Ct. App., Nov. 21, 2012) (citing 16 Williston on Contracts §

---

[3] While by no means dispositive, the Court notes that a more recent edition of *Black's Law Dictionary* defines loss as "the failure to maintain possession of a thing" and, in the context of insurance, as "The amount of financial detriment caused by an insured person's death or an insured property damage, for which the insurer becomes liable." *Black's Law Dictionary* (10th ed. 2014). The 10th edition includes almost 40 separate definitions of loss in different contexts. (*Id.*).

8

49:17 (4th ed.) ("A policy term will not be found to be ambiguous simply because it is not defined within the policy, or because it has more than one meaning, or a broad meaning.")

The word "loss" is undisputedly a word susceptible to many meanings depending on context. However, the meaning of "loss," specifically whether it encompasses loss of use or loss of access, must be considered in the overall context of the Policy language. Here, "loss" is modified by "direct" and "physical" and must be "to property." A "direct physical loss to property" does not reasonably encompass loss of access to the property or loss of functionality of the property. To the contrary, "direct physical" implicates a tangible impact to the property's structure – not necessarily in the sense that the property must become structurally unsound, but that there is some material, tangible, physical alteration to the property. The Court finds that "physical loss" unambiguously requires tangible alteration to the property.

Plaintiff's argument that this construction fails to give distinct meaning to the terms "physical loss" and "physical damage" is unpersuasive. "Loss" and "damage" have distinct meaning even where both require tangible alteration to property. As stated by another district court in this circuit, "the ordinary use of these terms … can only be reasonably construed as extending to events that impact the physical premises completely (loss) or partially (damage)." *Dino Drop, Inc. v. Cincinnati Ins. Co.*, No. 20-12549, 2021 WL 2529817, *5 (E.D. Mich. Jun 21, 2021) (quoting *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.*, 513 F. Supp. 3d 623, 630 (W.D. Penn. 2021)); *see also*, *1210 McGavock St. Hospitality Partners, LLC v. Admiral Indemnity Co.*, 509 F. Supp. 3d 1032, 1042 (M.D. Tenn. 2021) (holding that similar policy language required the plaintiff to show "a distinct, demonstrable, physical alteration of the property").

This interpretation also harmonizes with the policy as a whole. This is particularly evident in the context of the Policy provision limiting business income coverage to the "Period of

Restoration," a period that ends when the property at the premises should be "repaired, rebuilt, or replaced." (Policy, Doc. No. 1-14, at PageID# 151, 171-72). This provision plainly contemplates actual repair or replacement of physically damaged property. If direct physical loss to property could be established with loss of use without tangible physical harm to the property, the clause defining "period of restoration" would be superfluous – there would be no "period of restoration," only a period of loss of use.

Plaintiff's reliance upon *Southeast Mental Health Ctr., Inc. v. Pacific Ins. Co., Ltd.*, 439 F. Supp. 2d 831 (W.D. Tenn. 2006), for the proposition that, in Tennessee, physical damage can include "loss of access, loss of use, and loss of functionality" is uncompelling. In that case, the plaintiff sought coverage for loss of income due to a power outage which caused it to close one of its facilities for two weeks and impeded service at two other facilities. *Id*. at 834. The policy provided coverage for lost business income due to suspension of operations "caused by direct physical loss of or damage to property at [the insured] premises." The court held that the policy language was clear and unambiguous that the scope of coverage was limited to circumstances in which there is physical damage to the insured property. *Id*. at 837. Because the physical damage was to power and utility lines that were not located on the plaintiff's property, it was not entitled to compensation for lost income due to loss of use of the property. *Id*.

The language quoted by Plaintiff regarding "loss of access, loss of use, and loss of functionality" was with regard to a computer which lost data due to damage from a power outage. *See id*. at 838. The insurance company argued that the data loss, which was not accompanied by physical damage to the computer, was not a covered loss. *Id*. at 837. The *Southeast* court found that with regard to computers and loss of data, "'[P]hysical damage' is not restricted to the physical destruction or harm of computer circuitry but includes the loss of access, loss of use, and loss of

10

functionality. The computers 'physically lost programming information and custom configurations necessary for them to function' when they were damaged by the power outage." *Id*. at 838 (quoting *Am Guar. & Liability Co. v. Ingram Micro, Inc*., No. 99-185, 2000 WL 726789 (D. Ariz. Apr. 18, 2000)). The *Southeast* court did not extend this reasoning to include "loss of access, loss of use, and loss of functionality" of the premises itself. Indeed, as discussed above, the court held the opposite. Despite losing use of its premises for two weeks, there was no coverage under the policy because there was no direct physical loss or damage to the premises. *See id*. at 837.

Plaintiff also argues that a number of federal courts that have analyzed similar or identical policy language have reached the opposite conclusion. *See e.g., Studio 417 Inc., et al. v. Cincinnati Ins. Co*., 478 F. Supp. 3d 794 (W.D. Mo. 2020); *K.C. Hopps Ltd. v. Cincinnati Ins. Co*., No. 20-cv-00437, 2020 WL 6483108 (W.D. Mo. 2020) (same); *Henderson Rd. Rest. Sys. v. Zurich Am. Ins. Co*., No. 1:20-cv-01239, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021); *Serendipitous, LLC/Melt v. Cincinnati Ins. Co*., No. 2:20-cv-00873, 2021 WL 1816960 (N.D. Ala. May 6, 2021). These cases, however, express the minority view. The vast majority of courts, including those applying Tennessee law, have concluded that "direct physical loss" and "direct physical damage" require tangible harm to the property.[4] *See e.g.*, *Oral Surgeons, P.C. v. Cincinnati Ins. Co*., 2 F.4th 1141 (8th Cir. 2021) (examining identical policy language and concluding that "direct 'physical loss' or 'physical damage' … [requires] some physicality to the loss or damage or property – e.g., a physical alteration, physical contamination, or physical destruction"); *1210 McGavock St. Hospitality Partners, LLC v. Admiral Indemnity Co*., 509 F. Supp. 3d 1032, 1042 (M.D. Tenn. 2021) ("plaintiff has certainly suffered economic loss, but it is unable to show that is has suffered

---

[4] On August 4, 2021, the parties filed a Joint Notice of Supplemental Authority (Doc. No. 41), listing more than 300 cases involving claims for COVID related business losses under insurance policies with similar or identical policy language. The vast majority of these cases – 287 of them – dismissed the claims.

'direct physical loss of or damage to' the premises or property covered by the Policy"); *SFDG LLC v. The Cincinnati Ins. Co.*, No. 1:20-cv-237, 2021 WL 4057573, at *4 (E.D. Tenn. Aug. 31, 2021) (finding identical policy language unambiguously requires some form of tangible harm to the insured property); *Goodwood Brewing, LLC v. United Fire Grp.*, No. 3:20-cv-306-RGJ, 2021 WL 2955913, at *6-7 (W.D. Ky. Jul. 14, 2021) (noting that the majority of courts to have considered the question have concluded that "direct physical loss of or damage to" requires a tangible loss of or harm to the insured property); *Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, No. 1:20-cv-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021); *Chelsea Ventures, LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-13002-MAG-APP, 2021 WL 2529821, at *4 (E.D. Mich. Jun. 21, 2021) (collecting cases and noting that "the great weight of decisions recently considering this issue in the midst of the current pandemic have reached the same conclusion" – that physical loss or physical damage requires alteration to an insured property).

This Court agrees with the majority of federal courts to have construed identical or similar policy language that "direct physical loss or damage" requires tangible, material, physical alteration to property.

2. <u>Physical Loss and Physical Damage Due to the Presence of COVID-19 on the Premises</u>

Plaintiff argues that the physical presence of COVID-19 in the restaurant constitutes direct physical loss or damage to the premises. In making this argument, Plaintiff cites to a number of cases in which the premises did not suffer tangible harm but was rendered uninhabitable or unfit for occupancy. *See Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12-cv-04418, 2014 WL 6675934, at *2 (D.N.J. Nov. 25, 2014) (heighted ammonia levels rendered a packaging facility unsafe for occupancy until the ammonia could be dissipated); *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W. Va. 1998) (home was uninhabitable due to risk of falling

boulders); *Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) (asbestos contamination, which may "seriously impair[] or destroy[] a building's function" and render the property "useless by the presence of contaminants" may constitute a direct physical loss to property); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (building rendered uninhabitable due to the accumulation of gasoline under the structure); *Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 655 (1962) (property uninhabitable after a portion of the soil under the structure gave way to a landslide).

These cases have no application here. Pizza Loves Emily does not allege that the property was rendered uninhabitable due to COVID-19, only that it was unable to use the property for on-premises dining. Moreover, the COVID Orders do not suggest that on-site dining was banned due to the presence of COVID-19 at the restaurants. Indeed, the COVID Orders indicate that the perceived risk of COVID-19 lay not within "contaminated" premises, but with large gatherings of people. For example, the Nashville Safer at Home Order discouraged all gatherings and prohibited gatherings of more than ten people. (Doc. No. 1-3). The order of the Mayor of Washington, D.C., stated "[o]ne proven way to slow the transmission of COVID-19 is to limit interactions among people to the greatest extent practicable by limiting public activity." (Doc. No. 1-5, ¶ 6).

The other COVID Orders identified by Plaintiff express similar rationale. *See e.g.*, Order of the Governor of the Commonwealth of Pennsylvania, May 8, 2020 (Doc. No. 1-7) (the most efficient and practical means for the prevention and spread of COVID-19 include isolation and quarantine); Emergency Order, Office of the Mayor, City of Philadelphia, March 22, 2020 (Doc. No. 1-10) (noting that "scientific evidence shows that preventing unnecessary close contact of individuals is an effective way to mitigate the spread of communicable diseases like COVID-19"); Emergency Executive Order, Office of the Mayor, New York City, March 16, 2020 (Doc. No 1-

12) (observing the "reduction of opportunities for the person-to-person transmission of COVID-19 in meetings and other gatherings is necessary to combat the spread of the disease").

Plaintiff's allegation that the coronavirus is or was physically present on its premises does not plausibly allege a tangible harm to the property. The COVID-19 coronavirus does not cause "direct physical loss" or "direct physical damage" to the property, even if the virus can, as Plaintiff alleges, stay alive on surfaces for "at least 17 days" and "up to four weeks in low temperatures." (Compl., Doc. No. 1, ¶ 37). Numerous courts have noted that the virus does not physically harm property and can be eliminated simply by cleaning and disinfecting surfaces. *See e.g., Dino Drop, Inc. v. Cincinnati Ins. Co.*, No. 20-12549, 2021 WL 2529817, *5 (E.D. Mich. Jun 21, 2021); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 2021 WL 2163604, at *4 (E.D. Mich. May 27, 2021); *Kitch v. Aspen Am. Ins. Co.*, No. 20-11930, 2020 WL 7338570, at *4 (E.D. Mich. Dec. 14, 2020) ("[l]ike other viruses, COVID-19 injures people but does not seem to cause any lasting damage to physical property"). The need for cleaning does not, by itself, equate to physical loss or damage to property. *See e.g.*, *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 572 and n.7-8 (6th Cir. 2012) (applying Michigan law) (mold and bacterial contamination did not constitute "direct physical loss or damage" because the affected property could be cleaned and suffered no tangible physical damage); *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020) (an item that merely needs to be cleaned has not suffered a "direct physical loss").

In summary, Plaintiff has not plausibly alleged direct physical loss or direct physical damage to the covered property and, therefore, has failed to plausibly state a covered claim under the Policy.[5]

---

[5] The lack of a virus exclusion in the policy has no bearing on the interpretation of the language regarding what constitutes a covered loss. *See Blaine Const. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 349

## B. Civil Authority

Pizza Loves Emily also argues that its business loss is covered by the Civil Authority provision in the Policy because the public was prohibited from onsite eating and drinking at the restaurant, which plaintiff construes as prohibiting customer access to the restaurant premises. (*See* Doc. No. 34 at 24). Plaintiff argues the phrase "prohibits access to the premises" is ambiguous with regard to whether it requires a prohibition of *all* or *complete* access to the premises. (*Id.*).

The Civil Authority provision provides:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property …

(Doc. No. 1-5 at PageID# 152).

The Court finds this provision does not apply to Plaintiff's claim for coverage. The Civil Authority provision unambiguously has several requirements for coverage that are not met here. First, the provision requires a covered cause of loss caused damage to property other than the Plaintiff's. As discussed above, the coronavirus does not cause property damage. Second, the provision requires that access to the surrounding property is prohibited by civil authority as a result of the damage. Even if Plaintiff could show physical damage, the COVID Orders did not prohibit

---

(6th Cir. 1999) (applying Tennessee law) (claimant has the initial burden of proving it comes within the terms of the policy).

access to the property. That the public was unable to consume food and beverages on the premises cannot reasonably be construed to constitute lack of access to the property. Moreover, the COVID Orders were not issued as a result of property damage, but to control the spread of the virus by limiting human interaction, particularly in large gatherings.

Accordingly, the Court finds that Plaintiff has not stated a plausible claim for coverage under the Civil Authority provision.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss (Doc. No. 29) will be GRANTED. An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE